## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**LARRIS L. WOODS,**
        **Plaintiff,**

**v.**                                             **No: 3:06cv445/LAC/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant.**

_____

### REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Woods' application for disability insurance benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability and SSI benefits claiming a disability onset date of November 30, 1999.  His applications were denied initially and on reconsideration and plaintiff requested a hearing before an Administrative Law Judge (ALJ).  A hearing was held on December 15, 2005 at which plaintiff was represented by counsel and testified.  The plaintiff's mother and a vocational expert also testified.  The ALJ rendered an unfavorable decision on May 19, 2006 (tr. 17-32) and the Appeals Council declined review (tr. 8-10),  making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff met the insured status requirements of the Act through September 20, 2004, but not thereafter; that he had severe impairments of degenerative disc disease of the lumbar spine, hypertension, obesity, bipolar disorder NOS, impulse control disorder, and anti-social traits, but that he did not have an impairment or combination of impairments that met or medically equaled one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; that he had the residual functional capacity to perform unskilled work at the medium exertional level and could lift and carry 25 pounds frequently and 50 pounds occasionally, could stand/walk for six hours in an eight hour workday, had mild postural limitations, could understand, remember and carry out simple instructions and had moderate limitations in his ability to respond appropriately to work pressures; that he could not perform his past relevant work; that he was a younger individual with a high school education and one year of college; that there were jobs in significant numbers in the national economy that he could perform; and that plaintiff was not disabled as defined in the Act (tr. 17-32).

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence. *Falge, supra*. The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps.  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

The oldest medical records in the transcript cover the period from June 19, 1987 to November 1990.  During that time plaintiff was seen for various medical problems including a complaint of left foot drop because of low back problems.  He also apparently complained about some depression relative to a pending divorce (tr. 392).  On x-ray there was a cleft in the posterior arch of the transitional vertebral body consistent with spina bifida occulta, but there were no fractures, subluxations or bone destructive lesions.  The disc spaces appeared to be within normal limits (tr. 409).  The record is then silent until ten years later, when in February 2001 plaintiff was seen at The Lakeview Center in Pensacola, Florida ("Lakeview") by Dr.

Shams.  Plaintiff reported that he had been on Restoril, Ativan and Zoloft from Dr. Samanta (also with Lakeview) but that he had been off medications for almost two years.  Dr. Shams noted that plaintiff used marijuana up to two or three times per week and drank up to a case of beer every day or every other day.  On examination he was untidy with minimal hygiene, was casually dressed but had no motor distress.  He had a series of burns on the backs of his left arm that were circular in shape of several weeks duration.  His mood was dysphoric and his affect was apprehensive.  Dr. Shams diagnosis was depressive disorder and rule out bipolar disorder, and he recommended voluntary admission to the Crisis Stabilization Unit for evaluation and treatment which the plaintiff refused.  Dr. Shams also recommended drug rehabilitation, in which plaintiff expressed no interest.  Dr. Shams refused to prescribe Ativan or Restoril but gave plaintiff a small amount of Zoloft (tr. 238-240).

Plaintiff next saw Dr. Shams on May 25, 2000 and reported that he was "basically feeling well, and he does not have any acute or concerning problems at this time." (Tr. 446). His mood was dysthymic and his affect was constricted.  Dr. Shams recommended outpatient counseling and psychotherapy, refilled his Zoloft prescription and prescribed Depakote.  On July 31, 2000, Dr. Shams filled out a residual functional capacity questionnaire in which he opined that plaintiff's difficulty in maintaining social functioning and episodes of deterioration or decompensation were marked;  his restriction on activities of daily living, deficiencies in concentration, persistence or pace, and impairment on the ability to perform jobs requiring repetitive manual dexterity were moderate; his ability to respond appropriately to supervision and to work with co-workers was marked; and his ability to carry out instructions, perform simple tasks, and perform repetitive tasks was mild.  Dr. Shams further opined that side effects of the medication were negligible and commented that the plaintiff needed further trials in pharmalogical

interventions.  Finally, he assigned a global assessment of functioning (GAF) of 55 presently, and 50 over the past year.[1]  He further noted that it was necessary to obtain a more detailed history and administer a trial with mood stabilizers to better assess the plaintiff's mood disorder and necessary treatment (tr. 345-347).

Later that summer, on September 15, 2000, plaintiff was seen at Lakeview Center by Jason Jones, ARNP, a nurse practitioner whose primary function was medication management.  Plaintiff told Mr. Jones that he might have to go back to jail for ten months to a year because he violated his parole concerning a domestic violence incident with his girlfriend.  He was apparently on probation and getting weekly urinalyses so he was not drinking or using drugs.  He was neatly dressed and well groomed.  He had started Neurontin and felt rested.  His affect was appropriate and his mood was euthymic.  He still had mood swings but his medication soothed him when he got angry.  The medication also helped to reduce his anxiety.  He said that his depression was largely due to discussions and arguments he had with his girlfriend.  Plaintiff was otherwise oriented and attentive (tr. 444-445).  A few weeks later Dr. Shams filled out another residual functional capacity questionnaire which showed much greater restrictions than previously.  Nearly all of the restrictions on plaintiff's abilities to function were noted as "marked."[2]  There was only a "slight" restriction in activities of daily living and "moderate" restrictions on his ability to perform simple tasks or repetitive tasks in

---

[1]The Global Assessment of Functioning (GAF) scale is a 100 point scale used to assess overall psychological functioning.  A GAF score of 51 to 60 represents moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social or occupational functioning, (e.g., few friends, conflicts with peers or co-workers.)  A score between 41 and 50 indicates an individual with serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34 (2000).

[2]A marked restriction is one which "indicates an impairment which seriously affects ability to function."  (Tr. 456).

a work setting.  It was also noted that plaintiff was "not likely" to respond appropriately to co-workers in a work setting.  Dr. Shams also opined that plaintiff had bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes, had marked restriction in activities of daily living (although notably, on a different section of the form, Dr. Shams indicated that restrictions to activities of daily living were slight), that he had deficiencies in concentration, persistence, pace, episodes of deterioration or decomposition at work and that he had a GAF of 45-50 presently, and in the previous year less than 50 (tr. 455-457).

Although the record is not altogether clear, it appears that plaintiff was an inpatient at Lakeview from May 31, 2001 to August 31, 2001.  At the time of intake he indicated that his life had become unmanageable and out of control, he had continuous legal consequences of jail, financial problems and inability to form close relationships, was using up to four joints of marijuana daily and a case of alcohol daily, was sporadically using cocaine, crystal methamphetamine, and LSD.  He remained substance free for the entire time he was in treatment at Lakeview.  At the time of discharge, he was stable and ready to move back into the community.  He had a sponsor and was actively working a 12-step program (tr. 194-196).

While plaintiff was at Lakeview for inpatient treatment, he was seen by Jason Jones, A.R.N.P.  On June 13, 2001, he told Mr. Jones that he was not thrilled about being in drug and alcohol treatment and was not sure whether he was going to be able to stay abstinent, but felt that it was in his best interest to go through with the program.  He indicated that he still had problems with his girlfriend and that he planned to stay away from her and get counseling.  He was on Lithium Carbonate, Restoril, Hydroxyzine and Zoloft.   He was given supportive counseling for maintaining sobriety (tr. 199-200).  Plaintiff saw Mr. Jones again three weeks later on July 9, 2001.  Plaintiff said he was doing well on his current medications and was

getting along better with his girlfriend, who was also seeking psychiatric treatment. He was still an inpatient at Lakeview for drug and alcohol abuse and indicated that he felt better physically (tr. 197-198).

Although the exact dates are unclear, it appears that plaintiff was in jail from July 2001 (upon his release from Lakeview's treatment program) until October 2002. On December 13, 2002 he saw Kaberi Samanta, M.D., a psychiatrist at Lakeview.  He indicated that he had been in and out of jail for two years and had finally been released on October 5, 2002.   While incarcerated he had continued with his medication of lithium and Endoral and wanted to have these prescriptions continued.  He was living with his girlfriend and admitted that he had been in prison because of domestic violence secondary to anger.  He denied drinking any alcohol or doing any drugs at that time.  His speech was relevant and goal oriented, he did not show any aggression or agitation but admitted to a problem with anger and losing control easily.  His insight was fair and his judgment was questionable.  Dr. Samanta diagnosed alcohol abuse in remission and bipolar disorder, NOS, along with antisocial personality disorder (236-237).  Plaintiff saw Dr. Samanta again four months later on March 13, 2003.  He reported that his relationship with his girlfriend continued to be a problem.  He also said he was not drinking much except to keep company with his girlfriend.   He denied doing any drugs other than Lortab prescribed for his back pain.  He was not taking his Vistoril because it was not helping.  He felt like he was "in the middle" because he was controlled by his girlfriend and was having homicidal thoughts toward nobody in particular.  He was somewhat disheveled and unkempt, his speech was loud and tangential.  He did not show any agitation or aggression but admitted he had a problem with anger and getting agitated easily.  Dr. Samanta added Depakote to plaintiff's medications and diagnosed alcohol abuse in remission, bipolar disorder NOS, impulse control

disorder and anti-social personality disorder.  She assigned a current GAF of 50 (tr. 234-235).

Over the next two years, plaintiff was seen periodically at Lakeview by Mr. Jones.  On May 15, 2003 he indicated that he was still angry and having girlfriend problems (tr. 233), and on May 30, 2003 his condition was about the same (tr. 231-232).  On October 30, 2003 he reported that he had been in jail for about a month because of girlfriend problems (tr. 305); and on November 20, 2003 he reported that he was doing much better with lithium but continued to have problems with his girlfriend (tr. 303-304).  On February 7, 2004 he reported that he was having girlfriend problems and wanted out of the relationship, but denied depression, irritability, mood swings or mania, and blamed his conflict with his girlfriend entirely on her drinking (tr. 302).  On March 6, 2004 plaintiff was admitted to the Lakeview Center Crisis Stabilization Unit ("CSU").  He reported that his main problem was with his ex-girlfriend.  He had been in jail, again on domestic violence charges which he blamed on his girlfriend.  He also reported that he was drinking about a 12 pack of beer per week but denied any substance abuse.  He felt like he was in a situation in which his ex-girlfriend had been haunting him and accusing him of domestic violence that he had never been a part of.  At the time of the interview, he was disheveled but in no acute distress, was dysphoric, angry and anxious.  His affect was constricted but there was no formal thought disorder, delusions or hallucinations.  He admitted to having suicidal ideation but denied any idea of homicide.  The admitting psychiatrist, Venkata Sompalli, M.D., had a diagnostic impression of adjustment disorder with mixed mood and conduct changes, rule out alcohol abuse, rule out organic affective syndrome, and history of bipolar affective disorder (tr. 352-354).  Four days later plaintiff was discharged from the CSU by Dr. Samanta.  His mental status was alert, oriented and cooperative.  His affect was normothymic and pleasant, he was responsive to questions appropriately and denied any thought to hurt himself or

others.  He was much calmer than when he was initially admitted and was requesting discharge.  He also reported that there was apparently a warrant out for his arrest.  Dr. Samanta diagnosed adjustment disorder with mixed mood and conduct changes, bipolar disorder, mixed features and alcohol abuse and assigned a GAF of 50 (tr. 355).

Plaintiff was in jail from April 2004 (apparently shortly after he was released from the CSU) until January 2005.  On January 7, 2005 he was interviewed by Jason Jones and indicated that he had been out of jail for about a week and had run out of medication.  "As usual, the patient has been incarcerated because of difficulties with his girlfriend."  He said he was going to live with his mother for a few days and then call his girlfriend and try and break things off, "but as usually happens, they get back together, and there is more trouble."  (Tr. 358).  Plaintiff was not depressed, although he was worried about further contact with his girlfriend.  In fact, his girlfriend had picked him up when he got out of jail.  There were no warrants out against him and for the first time he felt like he was truly free.  He denied depression or suicidal or homicidal ideas, intent or plans, denied irritability, mood swings or mania, and denied use of alcohol or street drugs.  He was continued on lithium and thorazine which appeared to have treated his problems successfully (tr. 358-359).

On April 21, 2005 he returned to Lakeview seeking substance abuse counseling to fulfill a DUI requirement as a result of his third DUI arrest.  He denied suicidal or homicidal ideation or hallucinations, denied irritability, mood swings or mania and seemed to have gained an understanding and working knowledge of recovery skills.  The interviewer, Karen McAllister, whose credentials are unknown, indicated that he would benefit from out-patient substance abuse counseling (tr. 360-361).

Plaintiff's last visit to Lakeview was on May 18, 2005 when he again saw Mr. Jones.  He said that things were working well for him, that he had not seen his ex-

girlfriend since his last visit with Mr. Jones in January.  He had not been depressed, had not been irritable, and had not been in any kind of social trouble and was feeling quite happy about it.   Mr. Jones continued plaintiff's medication of lithium and thorazine and told him to return in three months (tr. 362-363).

On January 30, 2006, shortly after the evidentiary hearing, plaintiff's counsel took a sworn statement from Mr. Jones.  Mr. Jones testified that he was a nurse practitioner but with a masters degree in psychiatric nursing and a doctorate in counseling and development.  He had previously been a professor at the University of South Alabama in their nurse practitioner program.  His function at Lakeview was to do medication management with brief counseling with the patients.  He had seen the plaintiff for some "very brief basic counseling" but his major job was to manage medications (tr. 374-375).  Mr. Jones indicated that he worked with the plaintiff under the supervision of Dr. Samanta.  Mr. Jones indicated that plaintiff had been abstinent from alcohol and drugs for quite some time, over the last year or two, "probably more like two." (Tr. 379).   The plaintiff indicated that his lithium treatment was successful and that he did not want to drink while taking the medication.  An expected side effect from thorazine was drowsiness, and with lithium there could be a slight tremor if the lithium level were too high.  Mr. Jones had never noticed any tremor, but stated that if tremor were present plaintiff's lithium could be adjusted.  Mr. Jones further felt that plaintiff would have difficulty in concentration, operating heavy machinery, and doing "labor sorts of things." (Tr. 381).

Beginning in March 2000 plaintiff was treated at the Escambia Community Clinic, primarily by Fulton DeFour, M.D., a board certified internist.  Plaintiff was prescribed Lortab from his first visit in March 2000 through his last visit in October 2005.  Throughout his treatment at the clinic he had two primary problems: low back pain and an umbilical hernia.  From March 2000 until February 2003 plaintiff's clinic visits were primarily for medication refills (tr. 348-350, 458).  When he was released

Case 3:06-cv-00445-LC-MD   Document 20   Filed 10/19/07   Page 12 of 23

from jail in October 2002 he continued to see Dr. DeFour who continued to prescribe medication for him.  On January 22, 2003 Dr. DeFour performed a complete physical examination.   He noted that the plaintiff was unemployed due to his low back problems.  The physical examination, including examination of the bones, joints, muscles and extremities were noted to be within normal limits other than a distended abdomen secondary to an umbilical hernia (tr. 245-247).  The remaining records from the clinic are consistent with the earlier records of prescribing medication and noting low back pain and an umbilical hernia.  On February 11, 2003 Dr. DeFour indicated that he was scheduling an MRI for plaintiff's low back pain (tr. 244), but apparently this was never done.

On November 21, 2003 plaintiff's counsel took a sworn statement from Dr. DeFour (tr. 284-295).  Dr. DeFour testified that he was a board certified internist, that he had treated plaintiff for complaints of low back pain, but had never seen an x-ray, a myelogram or an MRI.  He felt that plaintiff could undergo surgery for his hernia if he would lose weight.  When asked about any work restrictions, he indicated that plaintiff should limit himself from lifting anything over 15 pounds for any significant length of time, that he would be unable to bend, stoop, or squat, that standing would be a problem for him and he would probably have to sit down after half an hour and, as to sitting, "a good guess would be not more than an hour at one time." (Tr. 295).

Plaintiff was seen in consultation by Jose Montes, M.D., a psychiatrist, on April 25, 2005.  He reported an essentially normal mental status examination although plaintiff was slightly depressed.  He felt that based on plaintiff's drug and alcohol abuse history, his prognosis was guarded, that he should continue his treatment at Lakeview, and participate in an alcohol abuse program.  Dr. Montes filled out a mental capabilities statement in which he opined that plaintiff was only slightly restricted in work area, and had a moderate restriction in responding appropriately to changes in a routine work setting or work pressures (tr. 334-340).

Plaintiff was also seen in consultation by C. W. Koulisis, M.D., a board certified orthopedic surgeon, on June 6, 2005. Physical examination was essentially normal, with no spasm or restriction in range of motion. X-rays revealed only spurring at L3-4. Dr. Koulisis opined that plaintiff had no physical restrictions other than a sensitivity to vibrations. His diagnosis was mild degenerative disc disease at L3-4 (tr. 323-332).

## DISCUSSION

The plaintiff argues that the ALJ erred in (1) failing to give appropriate weight to the opinions of the treating physicians, (2) in failing to find that plaintiff's umbilical hernia was severe, (3) in improperly discounting plaintiff's subjective complaints of pain, and (4) in rejecting the vocational expert's opinion on his ability to work. Plaintiff therefore contends that he was disabled from his onset date as a matter of law. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1.    <u>Treating physicians.</u>

      A.    <u>Dr. DeFour.</u>

Plaintiff first contends that the ALJ erred in rejecting the opinion of Dr. DeFour. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Crawford v. Commissioner of Social Security,* 363 F.3d 1155, 1158 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).

Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. *Wilson v. Heckler*, 734 F.2d 513, 516 (11th Cir. 1984).  In *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986), the Eleventh Circuit ruled:

> The [Commissioner] must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

786 F.2d at 1053.  The opinion of a nonexamining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician. *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987). *Compare, Wilson v. Heckler, supra*. "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232 (11th Cir. 2004), citing *Lewis*, 125 F.3d at 1440.

Here, the ALJ found that Dr. DeFour's opinion was based solely on the plaintiff's subjective complaints.  A careful review of the clinic medical record supports this finding.  Indeed, the record as a whole noted nothing other than plaintiff's statements that he had chronic low back pain.  There was no mention of any physical finding of any kind.  In his sworn statement Dr. DeFour admitted that he had never seen any radiographic studies, which undercuts plaintiff's argument here that Dr. DeFour's opinion was "based . . . on the x-ray confirmed diagnoses of

DDD and spina bifida occulta . . . ."  (Doc. 14, p. 14).  Moreover, the opinions of the examining physicians failed to show any meaningful limitations at all.  In short, what the ALJ had before him was a clinic record consisting of nothing more than subjective complaints, a very old x-ray that revealed a bony defect consistent with spina bifida occulta, a claimant who worked for twelve years *after* this x-ray finding, a 1999 x-ray that showed *mild* degenerative changes in the lumbar spine, and no treatment recommendations beyond routine pain medication.  It was reasonable for the ALJ to conclude that any or all of the grounds for good cause described in *Phillips, supra*, were present here.

Finally, neither consulting physician Lucey nor Koulisis (a board certified orthopedic surgeon) found anything to substantiate plaintiff's complaints.  The ALJ's finding that Dr. DeFour's opinion should be rejected was supported by substantial record evidence.

B.    Dr. Shams.

Plaintiff next argues that the ALJ should have credited Dr. Shams' opinion.  The ALJ found that Dr. Shams' opinion was entitled to little weight because the evidence upon which Dr. Shams based his opinion was, by his own admission, inadequate for valid assessment.  Dr. Shams first saw plaintiff on February 24, 2000, when plaintiff had been off his medication for two years (tr. 452).  He prescribed Zoloft and recommended plaintiff to the crisis stabilization unit, which plaintiff refused, and to drug rehabilitation, to which he did not seem agreeable (tr. 454).  Plaintiff returned on March 5, 2000.  His mental examination was "generally within normal limits."  (Tr. 451).  He admitted to having smoked marijuana, and was counseled not to drink or use drugs.  Plaintiff returned to Dr. Shams two years later, on May 5, 2002, and reported that he was "basically feeling well" and had experienced no side effects from his medication, which at the time were Zoloft and

Depakote (tr. 446).  There is no record that plaintiff saw Dr. Shams at any other time. Nevertheless, Dr. Shams filled out two residual functional capacity questionnaires. In the first, dated July 30, 2000, he opined that plaintiff's impairment in social functioning and episodes of decompensation were marked (tr. 345-47).   In the second, dated October 3, 2000 he opined that plaintiff also had marked impairment in deficiencies in concentration, persistence or pace, and in the ability to perform jobs requiring repetitive bilateral manual dexterity (tr. 456).   The only time plaintiff was at Lakeview between these two reports was when he saw Mr. Jones on September 15, 2000, and reported that he was doing well on his medications and that he had some depression due to arguments he had with his girlfriend.  Thus, Dr. Shams' opinion was actually contradicted by the medical record.  Plaintiff was taking his medication and was doing well in all mental aspects other than with his ongoing problems with his girlfriend.  The ALJ's finding that Dr. Shams' opinion was entitled to little weight was supported by substantial record evidence.

　　　　　C.　　Nurse Practitioner Jones.

　　The ALJ discounted Mr. Jones' opinions because it was inconsistent with the Lakeview treatment records.   As the ALJ noted, the Lakeview records, read chronologically, showed that plaintiff had major drug and alcohol problems along with issues with his girlfriend.  He finally took care of the drugs and alcohol, but his condition really improved when he separated from the girlfriend.  Every time he was assigned a low GAF score he had been in legal trouble or was doing drugs or dealing with problems in his relationship.  When plaintiff was last seen at Lakeview, he was doing well, he had not seen his girlfriend, he was not depressed, he was not irritable, and he was doing well (tr. 362).  Consulting psychiatrist Dr. Montes' felt that at worst plaintiff was only slightly depressed and that his judgment for basic life situations was only slightly constricted.  This opinion was rendered a month prior to plaintiff having told Lakeview that he had finally rid himself of his girlfriend, who,

in addition to his former drug and alcohol abuse, was obviously at the root of his problems.    The ALJ's decision discounting the opinions of Dr. DeFour, Dr. Shams and Mr. Jones was supported by substantial record evidence, and plaintiff is not entitled to reversal on this ground.

2.    <u>Hernia.</u>

Next plaintiff contends that the ALJ erred in not finding that his umbilical hernia was a severe impairment.  At step two the ALJ must determine whether the claimant has a severe impairment.  20 C.F.R. § 1520(c).  The burden at this step is on the claimant.  *Chester v. Bowen, supra.*  The Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe.
>
> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--
> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations;  and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether medical impairments are severe. The ruling provides in part:

> As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe"

and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856.

In *Brady v. Heckler*, 724 F.2d. 914 (11th Cir. 1984) the Eleventh Circuit used the test later adopted in SSR 85-28 to state that a claimant's abnormalities must be of such kind that they would not be expected to interfere with the individual's ability to work. The Eleventh Circuit has further explained that

[s]tep two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.

*McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It is not for the reviewing court to say that under these circumstances plaintiff's impairment is or is not trivial, only that the ALJ must properly justify his finding on that issue. And the ALJ's findings must be supported by substantial evidence.

Here Dr. DeFour found a hernia, and indicated that plaintiff should have it surgically repaired if he would lose weight. He lost weight, but never followed up on the surgery. There is no record showing that surgery was unavailable to him, and the record does not explain why it was not done. Failure to seek treatment can be used as a basis for discounting subjective complaints of pain. *Watson v. Heckler*,

738 F.2d 1169 (11th Cir. 1984). Also, the ALJ found that plaintiff's obesity was severe. The only evidence that the hernia was a problem was Dr. DeFour's opinion that the hernia would prevent plaintiff from lifting more than 15 pounds. That would not disqualify plaintiff from performing any of the light exertional level jobs that the ALJ found he could do. Therefore, plaintiff is not entitled to reversal on this ground.

3.      Plaintiff's subjective complaints of pain.

Next plaintiff says that the ALJ improperly discounted his subjective complaints of pain. As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[3] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *Ogranaja v. Commissioner of Social Security*, 186 Fed.Appx. 848, 2006 WL 1526062, *3+ (11th Cir. 2006) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the

---

[3]  *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1259 (M.D.Fla. 2005).   However, the presence or absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-840;  *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain he must do so explicitly and give reasons for that decision. *MacGregor v. Bowen*, 786 F.2d at 1054.   Where he fails to do so, the Eleventh Circuit has stated that it would thus hold as a matter of law that the testimony is accepted as true.  *Holt v. Sullivan*, 921 F.2d at 1223; *MacGregor v. Bowen*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an  explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted).  And of course, the reasons

articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-1226; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F.Supp.2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[4] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

The ALJ properly evaluated plaintiff's subjective complaints of pain and found that pain was not disabling. Plaintiff's complaints were found not to be fully

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

credible.  The record supports such a finding.  As noted earlier, although x-rays noted spina bifida occulta, no physician ever indicated that this condition was responsible for any of plaintiff's symptoms.  Plaintiff's argument here that the condition is "known to cause low back pain running down one or both legs" (doc. 14, p. 14) is not supported by any evidence of record.  When plaintiff's low back was x-rayed in 1999, the radiologist noted the condition, but his impression was mild degenerative changes in the lumbar spine.  No physician has connected this condition to plaintiff's symptoms.  That leaves the mild degenerative disc disease, which is insufficient to confirm either the severity of the alleged pain or that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *Hand, supra*.  Plaintiff is not entitled to reversal on this ground.


4.    <u>Vocational expert testimony.</u>

Finally, plaintiff contends that the ALJ improperly rejected the opinion of the vocational expert.  This argument, depends, however, on this court finding that the hypothetical posed by the ALJ, as opposed to the hypothetical posed by plaintiff's counsel, was incomplete.  A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."  *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004).  Here the hypothetical posed by the ALJ contained all the elements of his ultimate finding concerning plaintiff's residual functional capacity.  Consequently, the hypothetical posed by plaintiff's counsel is not controlling.

Plaintiff has failed to show that there was error in the ALJ's determination that he was not disabled as defined in the Act.  He is therefore not entitled to reversal. Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 19th day of October, 2007.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).